IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.           ) | Criminal No. 4:25-cr-3 |
| ) | |
| MARLON R. JONES, JR.   ) | |
| ) | |
| Defendant.    ) | |

## POSITION OF UNITED STATES ON SENTENCING

The United States of America – by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, and Brian J. Samuels, Assistant United States Attorney – hereby represents that it has reviewed the probation office's presentence report (hereinafter "PSR") and that it does not object to any of the facts or conclusions therein. For the reasons to follow, and the reasons to be offered during the sentencing hearing, the United States respectfully requests a sentence of incarceration at the low end of the advisory sentencing guidelines. This a case about corruption affecting our justice and penal system – a supervisory official at a residential reentry center who accepted bribes from an inmate in return for favorable treatment, including turning a blind eye to inmate violations. A guideline sentence is necessary to promote respect for the law, serve specific and general deterrence, and account for the seriousness of the crime of conviction.

## PROCEDURAL HISTORY

On January 23, 2025, the defendant, MARLON R. JONES, JR, was charged via Criminal Information with a single count of bribery, in violation of 18 U.S.C. § 210(b)(2)(C). On February 13, 2025, the defendant waived indictment and pled guilty to the Criminal Information. The Court accepted his plea, and the instant sentencing was scheduled for August 6, 2025.

OFFENSE OF CONVICTION

As the information in the Statement of Facts and PSR reveal, the defendant comes before the Court to be sentenced for his corrupt conduct in accepting bribes over a period of time related to his relationship with an inmate so that the inmate could avoid accountability for various infractions. *See generally,* SOF at ¶¶ 1-16; PSR at ¶¶ 6.1-6.18, 7-8. During the relevant time-period, in 2021 and 2022, the defendant served as the Assistant Director of James River Residential Reentry Facility (James River RRC).

According to the Bureau of Prisons website, RRCs, also known as "halfway houses" are in place to "provide a safe, structured, supervised environment, as well as employment counseling, job placement, financial management assistance, and other programs and services. RRCs help inmates gradually rebuild their ties to the community and facilitate supervising ex-offenders' activities during this readjustment phase." See https://www.bop.gov/about/facilities/residential_reentry _management _centers.jsp (visited July 31, 2025).

The defendant had multiple responsibilities, including overseeing inmates' compliance with the requirements of either the James River RRC, specifically, or the terms of their reentry programming generally, including home detention. Such duties included overseeing urinalysis appointments, location monitoring, and participating in the violation process, from writing incident reports, to notifying inmates of the hearings, to conducting or participating in the hearings.

Violations governed by that violation process included actions such as failing to charge a GPS ankle monitor, failing to turn in required paperwork like paystubs, and being in an unauthorized area. After such violations were discovered, the responsible supervising official recorded them in incident reports, which were then uploaded into COATS, a report management system.

The violations were colloquially referred to by their seriousness as established by the respective BOP categories, with the more serious violations being called "Level 1" and "Level 2" and the less serious ones as a "Level 3" or "300s" and "Level 4" or "400s." The more serious violations required hearings before the Center's Disciplinary Committee ("CDC hearings"), which often resulted in the inmate being returned to incarceration within a BOP facility to complete their sentence. The less serious 300 and 400 violations could be resolved by informal or formal hearings below the CDC level within the facility.

Inmate L.C. was released from a Bureau of Prison's (BOP) prison to home confinement in or about January 2021, with supervision being conducted through the James River RRC. The defendant had supervisory authority over Inmate L.C. From about at least April 2021, and continuing through at least in or about September 2022, the defendant had a direct relationship with Inmate L.C. that became both sexual and remunerative in nature. In addition to having sexual contact and exchanging sexual messages via telephone and text, L.C. paid the defendant on several occasions for assistance with making violations disappear by not serving the incident reports.

This pattern of conduct was revealed when another supervisor took over James River RRC and discovered that L.C. had had at least fourteen incidents, only three of which had been properly served. The three incident reports that had been properly served were reflected appropriately in L.C.'s record and led to disciplinary consequences. But the remainder that were unserved or improperly served on the defendant did not lead to formal consequences and were not properly recorded because they were invalid.

A forensic review of communications between the phones of the defendant (ending -5850) and L.C. (ending -6277) revealed hundreds of exchanges, including calls, text messages and other electronic account data. The messages revealed that the defendant both had sexual contact with

L.C. and exchanged explicit sexual messages with L.C. They also revealed numerous discussions about paying the defendant in exchange for the defendant failing to perform his official duties or corruptly performing them such that L.C. was able to avoid disciplinary consequences.

The defendant received both received physical currency from L.C. and money via electronic transfer. The defendant sent L.C. his CashApp account information – $m[XXXXXXXXX]6 and $o[XXXXXX]6 – to facilitate the electronic payments. The messages revealed that L.C. also referred other individuals to the defendant, including his cousin.: a February 10, 2022, message reads "A look cuz trying to pay u a few $ to go to his son game" and "I vouch for him he a good nigga." The defendant admitted he accepted payment from this cousin ("Belle") in exchange for the same type of official (in)action.

L.C. paid the defendant via CashApp a total of $650 over five transactions occurring between September 24, 2021, and March 29, 2022. Moreover, because L.C. did not use CashApp regularly, he also paid the defendant with an unknown amount of physical U.S. currency during the relevant time-period.

The defendant was initially questioned by agents in 2023. He was shown copies of incident reports that did not contain signatures. The defendant was not forthcoming about his involvement in the bribery scheme and denied assisting L.C. with incident reports. He did admit to taking some money via cash and Cashapp transactions, but minimized the amount he received and the action he took for L.C. PSR at ¶ 8.

THE DEFENDANT'S BACKGROUND

The defendant's background reveals a very supportive family structure, with no abuse, all necessities provided and a large and supportive extended family who instilled a work ethic in him. The defendant suffers from no physical, mental health or substance abuse issues. He is well

educated, with a bachelor's degree from Virginia State University and a reported master's degree from Bowi State University.  The defendant has worked regularly, though of course the offense of conviction occurred during his recent employment tenure and he was terminated for misconduct from the Harbor Point Behavioral Center.  The defendant has a minimal criminal history, consisting of one driving under the influence conviction in March 2015.  PSR at ¶ 26.

POSITION ON SENTENCING AND ARGUMENT

The United States recognizes that a sentencing court may not presume that a sentence within the advisory guideline range is reasonable; however, the guidelines remain a significant and pivotal component of the sentencing process.  The Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter."  *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).  Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.   The United States respectfully requests that the Court impose a sentence at the lower end of the advisory range.

*First*, the nature and circumstances of this offense are quite serious.  Notwithstanding his inappropriate relationship with L.C. (which is also an abuse of his the trust placed in him having supervision over L.C.) the defendant engaged in a series of bribes that involved not only the corruption of the incident reporting process, but the concealment of the incident-related conduct of L.C. that should have been considered in determining his performance/discipline while at the RRC.   The defendant took multiple forms of payment to make violations disappear and text messages reveal that the defendant, at times, asked L.C. for money to be sent to his CashApp.  The

defendant also extended the receipt of bribes to L.C.'s cousin for corrupt conduct. Though the amount of money in the transactions was not such that any loss enhancement was triggered, in this particular corrections setting, any bribery of prison officials for the benefit of inmates presents dangers beyond the monetary aspect. The defendant received guideline enhancements based on the multiple bribes at issue and due to the defendant being in a high-level or sensitive position.

*Second*, there is some lenience baked into this guideline range already. The defendant was untruthful with investigators when they first approached him. The United States does not believe this conduct arises to the level of an obstruction of justice or the denial of acceptance, but it is aggravating. Additionally, the guidelines do not account for the inherent power dynamic at play by an RRC supervisor taking a bribe from an inmate in a custodial status– this is not a situation where the defendant and L.C. were on an equal status playing field. There is a victimization/exploitation aspect to this relationship in the same way there would be between a teacher/student or employer/employee. Instead of providing assistance with accountability and other reentry services, the defendant allowed L.C. to continue a criminal course of conduct.

*Third*, the defendant has no significant criminal history and the guidelines certainly credit this. But this factor cuts both ways, as the defendant committed this crime as a mature, educated adult with no need to do this. This crime was not borne out of a troubled upbringing, the limitation that may attend a lack of education, desperate financial circumstances of a substance abuse struggle. The United States does acknowledge that the defendant did plead guilty to a Criminal Information and has been cooperative in the charging and resolution process.

*Fourth*, the Court should consider deterrence in fashioning a sentence for the defendant. The defendant was in a high-level position at the RRC with supervisory authority over L.C. He abused and violated his duty by engaging in this corrupt course of conduct. The RRC is an

important step in the reentry process for inmates and is designed to help inmates rebuild ties to the community and reduce the likelihood that they will recidivate. The conduct of the defendant corrupted this goal. Unfortunately, like many others, this district has not been immune to corruption within our government and specifically, within our prison system. This district regularly sees cases involving misconduct by employees at correctional institutions. But it is perhaps rarer to see an Assistant Director of a halfway house, and more troublesome – as the inmates are nearing completion of their sentences and rehabilitative process – the defendant actions frustrated that process.

So, with respect to specific deterrence, it is clear that even though the defendant was working with inmates who had recently been released from full-time incarceration, this did not cause the defendant to reconsider his conduct. This was no one-off criminal episode or temporary lapse in judgment. It occurred a number of times, over the course of a year and with more than one inmate.

But more than deterring the defendant, the Court's sentence must also send a message of general deterrence: corruption in law enforcement will not be tolerated. Using a position of trust, particularly one within the criminal justice system, for personal enrichment should be harshly punished and condemned. Without adequate deterrence, public corruption will continue, and the public's distrust will grow. Though there certainly may be numerous opportunities for corrections officials to misstep in interacting with convicted felons on a regular basis, the defendant could have easily blown the whistle and reported the solicitation, or simply walked away when asked to take money to conceal incident reports. Instead, the defendant repeatedly accepted bribes. The sentence in this case should be sufficiently serious to deter public officials from putting self-interest above loyalty to the law and safety of others. It also should send a message that the job of

a corrections official is one that requires integrity and fidelity.  A meaningful term of incarceration is required to promote respect for our anti-corruption laws and to restore faith in our law enforcement agencies. As put by one court, "[w]hen a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government." *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa), aff'd, 705 F. App'x 481 (8th Cir. 2017).

## CONCLUSION

This was not a crime of necessity, a one-off mistake, or a result of youthful indiscretion.  It represented a sustained and serious course of public corruption. For the foregoing reasons and others to be provided during the sentencing hearing, the United States respectfully requests the Court impose a sentence at the lower end of the advisory range.

        Respectfully submitted,

        Erik S. Siebert
        United States Attorney

By:        /s/
        Brian J. Samuels
        Assistant United States Attorney
        Virginia State Bar No. 65898
        Eastern District of Virginia
        Newport News Division
        Fountain Plaza Three, Suite 300
        11815 Fountain Way, Suite 200
        Newport News, Virginia 23606
        Tel. (757) 591-4000
        Fax: (757) 591-0866
        brian.samuels@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to the following:

Fernando Groene, Esq.
364 McLaws Circle, Suite 1A
Williamsburg, Virginia 23185

I HEREBY CERTIFY that on this 31st day of July 2025, I sent a true and correct copy of the foregoing to the following by electronic mail:

Jeffrey A. Noll
Senior U.S. Probation Officer
827 Diligence Drive, Suite 210
Newport News, Virginia 23606

                                               /s/
Brian J. Samuels
Assistant United States Attorney
Virginia State Bar No. 65898
Eastern District of Virginia
Newport News Division
Fountain Plaza Three, Suite 300
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866